**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 26-CV-26005-RAR**

HSA PGH, LLC d/b/a Palmetto General Hospital;
HSA CGH, LLC d/b/a Coral Gables Hospital;
HSA FMC, LLC d/b/a Florida Medical Center;
HSA NSMC, LLC d/b/a North Shore Medical Center;
HSA HH, LLC d/b/a Hialeah Hospital;
HSA GLENWOOD, LLC d/b/a Glenwood Regional Medical Center;
HSA PORT ARTHUR, LLC d/b/a Medical Center of Southeast Texas;
and HSA ST. JOSEPH, LLC d/b/a St. Joseph Medical Center,

Plaintiffs,

v.

UMR, INC.,

Defendant.
_______________________________________/

**DEFENDANT UMR, INC.'S MOTION TO COMPEL ARBITRATION AND TO STAY PROCEEDINGS, AND IN THE ALTERNATIVE, TO DISMISS THE AMENDED COMPLAINT, AND INCORPORATED MEMORANDUM OF LAW**

Pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 3–4, and the binding arbitration provision contained in the Administrative Services Agreement (the "Services Agreement") pursuant to which Defendant UMR, Inc. ("UMR") provided claims-administration services for the self-funded employee health benefit plans at issue in this action, UMR respectfully moves to compel Plaintiffs (collectively, "Plaintiffs" or "HSA") to arbitrate any dispute arising out of the Services Agreement, and to stay those disputes pending arbitration. In the alternative, and without waiving arbitration, UMR moves to dismiss the Amended Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

## INTRODUCTION

Plaintiffs want the benefits of their contract with UMR without its burdens. For an extended period, the eight HSA hospital entities accepted UMR's services as the third-party administrator of their self-funded health plan, funded the plan with some $24 million, and relied on the Services Agreement that governs that relationship. Now, in a dispute over the return of plan funds intended to pay health claims, Plaintiffs invoke that same relationship as the basis for their claim while asking this Court to disregard the one provision of the Services Agreement they find inconvenient: its broad, mandatory arbitration clause. The Federal Arbitration Act does not permit that.

The Services Agreement requires the parties to arbitrate "any dispute, claim, or controversy of any kind or nature between the Parties arising out of this Agreement or the Services." The parties' disputes arising out of that relationship: UMR's administration of the Plan's claims, the Run Out Claims, funding, and the parties' obligations on termination, fall squarely within that clause. Plaintiffs resist arbitration on two theories, both meritless under the New York law the Services Agreement selects: that the Services Agreement is unsigned, and that the HSA entities are not signatories. Neither survives scrutiny. An arbitration agreement need not be signed to bind parties who perform under it. And the Plaintiffs cannot disclaim the Services Agreement as the act of a stranger: the applicable health plan identifies American Healthcare Systems Corp Inc. as its Plan Sponsor, Plan Administrator, and Named Fiduciary and it identifies UMR as the third-party administrator for medical claims. Having accepted the direct benefits of UMR's administration of those services, Plaintiffs cannot repudiate its arbitration clause. Under the FAA and controlling precedent, once the Court determines that the parties formed an agreement to arbitrate and that Plaintiffs are bound by it, the Court must enforce that agreement according to its terms, and

questions concerning the scope of the dispute and compliance with procedural prerequisites are for the arbitrator to decide.

Because (1) a valid agreement to arbitrate exists, (2) Plaintiffs' claim falls squarely within it, and (3) UMR has not waived the right to arbitrate, the Court should compel arbitration and stay this action.

## BACKGROUND

### I. Procedural Posture.

On August 12, 2026, Plaintiffs filed their original complaint against UMR in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, styled *HSA PGH, LLC d/b/a Palmetto General Hospital, et al. v. UMR, Inc.*, No. 2026-016309-CA-01 and served UMR with process on August 19, 2026. Plaintiffs filed the operative Amended Complaint on August 26, 2026. On August 31, 2026, UMR timely removed the action to this Court on the basis of diversity jurisdiction pursuant to 28 U.S.C. §§ 1332, 1441, and 1446. In its Notice of Removal, UMR expressly reserved its right to compel arbitration and to seek dismissal under the Services Agreement. (ECF No. 1).

### II. Plaintiffs' Allegations.

Plaintiffs are eight limited liability companies that operate hospitals in Florida, Louisiana, and Texas. (Am. Compl. at ¶¶ 10–17). Plaintiffs allege that they "provided self-funded employee welfare benefit plans to provide health insurance coverage" to their employees, and that UMR "acted as third-party administrator for employee health benefit plans sponsored by the HSA entities." (*Id.* at ¶¶ 19, 24). Plaintiffs further allege that "UMR and HSA entered into an agreement whereby UMR agreed to provide the administrative processing services for those claims to HSA and their employees." (*Id.* at ¶ 25).

The Amended Complaint asserts a single count captioned "Injunctive Relief." Plaintiffs allege that, "[s]ince January 2026, HSA paid UMR approximately $24,000,000.00 for employee health benefit claims and UMR administrative fees required for the processing of claims under their employee health plans." (*Id.* at ¶ 27). Plaintiffs allege that UMR terminated its services effective July 31, 2026, but agreed to continue processing claims incurred on or before that date (the "Run Out Claims"). (*Id.* at ¶ 28). Plaintiffs contend that UMR is now "refusing to return an estimated $3,531,417.05 of HSA's funds," and seek an order "[r]equiring UMR to immediately return $3,531,417.05 of HSA's funds to HSA." (*Id*. at ¶ 1 & Count I prayer). Plaintiffs also allege that they "have satisfied all conditions precedent, or such conditions have been waived, prior to filing this action." (*Id.* at ¶ 22).

Plaintiffs acknowledge the existence of the Services Agreement and UMR's position regarding it. Plaintiffs allege that "UMR has taken the position that HSA is subject to an unsigned Administrative Services Agreement," that "HSA did not sign the Agreement," and that HSA disputes UMR's position that the performance of American Healthcare Systems Corp., Inc. ("AHS" or "Customer") under the Services Agreement affects UMR's obligations to HSA. (*Id.* at ¶ 26).[1]

**III. <u>The Services Agreement and Its Mandatory Arbitration Provision.</u>**

The Services Agreement is between UMR, Inc. and AHS and is "effective as of January 1, 2025." (Services Agreement at 1). It "governs the claims administration and related administrative services UMR is providing to Customer either directly or through one of UMR's affiliates (the 'Services')." *(Id.)* The Services Agreement is supported by mutual covenants and contains definite

[1] A true and correct redacted and excerpted copy of the Services Agreement is attached as **Exhibit 1**.

provisions governing the Services. (Ex. 1, Services Agreement §§ 1–10). The Agreement also expressly contemplates that the Customer's covered affiliated employers participate in the Plan[2] and receive the Services: Section 6.6 provides that "Customer and any of its affiliates covered under the Plan make up a single 'controlled group,'" and that the Services are provided to Customer "directly or through one of UMR's affiliates." (*Id.* § 6.6 & at 1).

Section 9 of the Services Agreement sets forth a mandatory, two-step dispute-resolution procedure culminating in binding arbitration. It provides:

> In the event of any dispute, claim, or controversy of any kind or nature between the Parties arising out of this Agreement or the Services ("Dispute"), a Party may provide written notification of the Dispute to the other Party. . . . If the Dispute is not resolved within 30 days after the Parties first meet to discuss it, and either Party wishes to pursue the Dispute further, that Party will refer the Dispute to binding arbitration.

The Services Agreement further provides that "[a]ny Dispute that has not been resolved pursuant to the above may be submitted to binding arbitration," that "[e]ither Party may initiate arbitration by filing a claim with the American Arbitration Association ('AAA') in accordance with the then-current Commercial Arbitration Rules of the AAA," and that the arbitration "will be conducted in accordance with the Arbitration Rules." (Services Agreement at § 9). By its terms, the arbitration provision survives termination of the Services Agreement. (*Id.* at § 10.3). The Services Agreement also permits execution by counterpart, facsimile, and electronic signature. (*Id.* at § 11.13). And the Services Agreement provides that it "is governed by, construed and enforced in accordance with the laws of the State of New York, without regard to the conflict of laws, rules, or principles thereof." (*Id.* at § 11.3).

---

[2] The name of the Plan is the AMERICAN HEALTHCARE SYSTEMS CORP INC. Group Health Benefit Plan and its terms are described in various Summary Plan Descriptions.

## IV. **The Plan's Designated Roles and Plaintiffs' Participation Under the Services Agreement.**

The self-funded plan that Plaintiffs allege UMR administered is the American Healthcare Systems Corp Inc. Group Health Benefit Plan (the "Plan").[3] (Ex. 2; *see* Am. Compl. at ¶¶ 24–25.) The Plan describes itself as a single, self-funded employee welfare benefit plan. (Ex. 2, Plan at 1-2). It identifies AHS as the Plan Sponsor, the Plan Administrator, and the Named Fiduciary. (*Id.* at 1–2.) The Plan identifies UMR as the third-party administrator for medical claims. (*Id.* at 2). The Plan thus confirms, on its face, that UMR provided the very claims-administration "Services" the Services Agreement governs, for the Plan sponsored and administered by AHS.

## **APPLICABLE LEGAL STANDARD**

Section 2 of the FAA provides that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. That provision reflects "both a liberal federal policy favoring arbitration, and the fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quotation omitted).

"Before enforcing an arbitration agreement, the court should ensure that the agreement was formed and that it applies to the dispute at hand." *Attix v. Carrington Mortg. Servs., LLC*, 35 F.4th 1284, 1294 (11th Cir. 2022). "Under the FAA, a district court must compel arbitration if (1) a valid written agreement to arbitrate exists, (2) an arbitrable issue exists, and (3) the right to arbitrate has not been waived." *Integrated Sec. Servs. v. Skidata, Inc.*, 609 F. Supp. 2d 1323 (S.D. Fla. 2009).

---

[3] *See* note 2. Additionally, a true and correct redacted and excerpted copy of the Summary Plan Description applicable to the Plaintiffs' employees is attached as **Exhibit 2**.

The Services Agreement evidences a transaction involving interstate commerce—a national third-party administrator providing claims-administration services to hospitals across Florida, Louisiana, and Texas—so the FAA applies. *See Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359 (11th Cir. 2005) (applying the involving-commerce standard and holding the FAA's commerce requirement satisfied because the party's overall practices affected interstate commerce).

**ARGUMENT**

**I. New York Law Governs the Formation and Enforceability of the Services Agreement.**

While the FAA supplies the framework governing this Motion, questions of contract formation and who is bound by an arbitration agreement are resolved under state law. *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630–31 (2009) (the FAA does not "alter background principles of state contract law regarding the scope of agreements," and "traditional principles of state law allow a contract to be enforced by or against nonparties"). Sitting in diversity, this Court applies the choice-of-law rules of the forum state, which here is Florida. *Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007) (holding that a federal court sitting in diversity will apply the conflict-of-laws rules of the forum state). Florida enforces contractual choice-of-law provisions unless the chosen law contravenes a strong Florida public policy. *Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.*, 761 So. 2d 306, 311-12 (Fla. 2000) ("[t]he underlying principle remains the same: the countervailing public policy must be sufficiently important that it outweighs the policy protecting freedom of contract."). The Services Agreement provides that it "is governed by, construed and enforced in accordance with the laws of the State of New York, without regard to the conflict of laws, rules, or principles thereof." (Services Agreement at § 11.3). Accordingly, New York substantive law governs the

formation and enforceability of the Services Agreement and its arbitration provision. Importantly, Florida law is in accord on each point addressed below and furnishes an independent, alternative basis for the same result.

## II. <u>A Valid, Written Agreement to Arbitrate Exists and Is Enforceable Notwithstanding That It Is Unsigned.</u>

### A. *Neither the FAA nor New York Law Requires a Signed Agreement.*

The FAA requires only that an arbitration agreement be "written;" it contains no signature requirement. 9 U.S.C. § 2; *see Caley*, 428 F.3d at 1369 (holding that while the FAA requires that the arbitration agreement be in writing, it does not require that it be signed by the parties). New York law is the same: "[a] contract may be valid even if it is not signed by the party to be charged, provided its subject matter does not implicate a statute—such as the statute of frauds—that imposes such a requirement." *Flores v. Lower E. Side Serv. Ctr., Inc.*, 4 N.Y.3d 363, 368 (2005) (internal citations omitted). Under New York law, contract formation turns on a meeting of the minds reflected by the parties' objective manifestations of assent, judged "by looking . . . to the objective manifestations of the intent of the parties as gathered by their expressed words and deeds." *Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 41 N.Y.2d 397, 399–400 (1977) (finding that a course of conduct can establish a binding contract).

### B. *The Parties' Performance Manifests Assent to the Services Agreement and its Arbitration Clause.*

Under New York law, a party may be bound by an unsigned agreement, including its arbitration provision, where the party's conduct manifests assent to its terms. In *God's Battalion of Prayer Pentecostal Church, Inc. v. Miele Assocs., LLP*, 6 N.Y.3d 371, 374 (2006), the New York Court of Appeals compelled arbitration under an unsigned contract, holding that by accepting performance under the agreement, the objecting party became bound by its terms, including the

arbitration clause. New York courts routinely enforce arbitration provisions in unsigned agreements on this basis. *See Crawford v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 35 N.Y.2d 291, 300 (1974) (assent to arbitrate may be established through conduct); *accord Burma Bibas, Inc. v. Toyoshima & Co.,* 60 A.D.2d 554, 555 (1977) (holding that a party which retained an unsigned contract containing an arbitration clause and accepted shipments over months without objecting "became bound by all the terms of the contract, including the arbitration provision").

The record here supports the same conclusion. UMR began providing the Services under the Services Agreement on or about January 1, 2025 to certain entities and on or about April 1, 2025 to the Plaintiffs, and the Plaintiffs accepted and utilized those Services. (Ex. 1; Ex. 2, Plan at 1–2.) The Services included adjudicating and processing health-benefit claims and furnishing related administrative support. (Ex. 1, Services Agreement at 1; Ex. 2, Plan at 1). Plaintiffs' own allegations confirm the underlying relationship: Plaintiffs concede that "UMR and HSA entered into an agreement whereby UMR agreed to provide the administrative processing services" (Am. Compl. at ¶ 25); that UMR "acted as third-party administrator" for their plans (*id.* at ¶ 19); and that HSA "paid UMR approximately $24,000,000.00" under that relationship (*id.* at ¶ 27).

The relief Plaintiffs seek—the return of plan funds paid to UMR for the administration of claims—presupposes the claims-administration relationship the Services Agreement governs. The documented provision and acceptance of those Services therefore support assent to the Services Agreement and its arbitration provision. Florida law is in accord, providing an independent and alternative basis for the same result. *See Fi-Evergreen Woods, LLC v. Robinson*, 135 So. 3d 331, 335-36 (Fla. 5th DCA 2013) (recognizing that under Florida law "[a] failure to sign an arbitration agreement does not automatically render the agreement invalid," and that in the absence of a signature courts look to the parties' words and conduct to determine assent; reversing and

remanding for an evidentiary hearing on assent); *Integrated Health Servs. of Green Briar, Inc. v. Lopez-Silvero*, 827 So. 2d 338, 339 (Fla. 3d DCA 2002) (holding that "[a] contract is binding, despite the fact that one party did not sign the contract, where both parties have performed under the contract," including its arbitration clause).

### C. *The Services Agreement's Execution Provisions do not Condition the Services Agreement's Effectiveness on a Signature.*

Plaintiffs are expected to rely on the Services Agreement's reference to an "executed" copy and its signature block to argue that execution was a condition of assent. The argument fails. The Services Agreement recites that it is "effective as of January 1, 2025," reflects a present agreement supported by mutual covenants, and contains definite Services, fee, funding, renewal, and termination terms. (Services Agreement at 1). Nothing in the Services Agreement's terms provides that the Services Agreement is ineffective until signed.

## III. <u>Plaintiffs Are Bound by the Services Agreement's Arbitration Provision Under New York Direct-Benefits Estoppel.</u>

Plaintiffs' second theory, that they are not signatories to the Services Agreement, which names AHS as "Customer," does not permit them to escape arbitration. Under ordinary principles of state contract law, a non-signatory may be compelled to arbitrate, *Arthur Andersen*, 556 U.S. at 631, and New York recognizes several theories under which a non-signatory is bound, including estoppel. UMR does not contend that Plaintiffs are intended third-party beneficiaries of the Services Agreement. Rather, UMR's position is that Plaintiffs' own knowing acceptance of the Services rendered under the Services Agreement, and their assertion of duties that exist only under the Services Agreement, estop them from disclaiming the Services Agreement's arbitration provision.

The direct benefits Plaintiffs knowingly accepted flow from services UMR provided under the Services Agreement. The Plan identifies AHS as the Plan Sponsor, Plan Administrator and Named Fiduciary, and identifies UMR as the third-party administrator for medical claims. (Ex. 2, Plan at 1-2). The Services Agreement provides that Customer and affiliates covered under the Plan constitute a single controlled group and governs UMR's services. (Ex. 1, Services Agreement § 6.6 and at 1). Plaintiffs' own allegations that UMR acted as third-party administrator and that Plaintiffs paid approximately $24 million for claims and administrative fees are consistent with that documented performance. (Am. Compl. at ¶¶ 19, 27). Having knowingly accepted those direct benefits of the Services Agreement, Plaintiffs are estopped from disclaiming the arbitration provision contained in it. *See God's Battalion,* 6 N.Y.3d at 374 (compelling arbitration where a non-signing party accepted performance and operated under the contract); *cf. Belzberg v. Verus Invs. Holdings Inc.,* 21 N.Y.3d 626, 630-31 (2013) (stating the New York direct-benefits estoppel standard).

**A. *Direct-benefits Estoppel Binds Plaintiffs, Whose Claim Relies on and Seeks the Benefits of the Services Agreement.***

Under New York's direct-benefits estoppel doctrine, a non-signatory "may be compelled to arbitrate where it 'knowingly exploits' the benefits of an agreement containing an arbitration clause, and receives benefits flowing directly from the agreement." *Belzberg,* 21 N.Y.3d at 630–31 (quotation omitted); *accord Temple v. Best Rate Holdings, LLC*, 360 F.Supp.3d 1289, 1308-1312 (M.D. Fla. 2018) (applying New York law to compel arbitration at a non-signatory's behest under estoppel where the signatory's claims arise under the subject matter of the agreement and a close relationship exists between the signatory and the non-signatory). Unlike the non-signatory in *Belzberg*, whose claimed benefit the Court found "too attenuated" because it flowed from his relationship with a third party rather than from the arbitration-bearing agreement,

the Plaintiffs' benefits trace directly to the Services Agreement itself: UMR rendered the Services the Services Agreement prescribes, and Plaintiffs accepted them and paid approximately $24 million under the Services Agreement. The benefit is therefore one "traced directly to the agreement containing the arbitration clause." *Id.* at 633. Estoppel binds Plaintiffs to arbitrate the parties' disputes arising under the Services Agreement, the administration relationship and any claim that UMR breached "its contractual obligations."

A party cannot have it both ways by relying on a contract when it works to its advantage while avoiding the contract's arbitration provision. *Bailey v. ERG Enterp., LP,* 705 F.3d 1311, 1320 (11th Cir. 2013) (explaining that equitable estoppel lets a non-signatory enforce a contract against a signatory where the signatory relies on the contract to assert its claims, and that the doctrine prevents a party from invoking a contract to establish its claim while disclaiming the contract's burdens). That is precisely what Plaintiffs attempt here. The parties' relationship and any dispute arising out of it, UMR's administration of the Plan's claims, the Run Out Claims, funding, and the parties' respective obligations upon termination, are established and governed by the Services Agreement, and Plaintiffs' allegations depend on that very relationship. Plaintiffs allege that UMR "agreed to provide the administrative processing services" for their plans (Am. Compl. at ¶ 25), that UMR served as their "third-party administrator" (*id.* at ¶ 19), that Plaintiffs paid UMR approximately $24 million under that arrangement (*id.* at ¶ 27), and that UMR breached "its contractual obligations" in administering those funds (*id.* at ¶ 8). These are obligations that exist, if at all, only under the Services Agreement. Because Plaintiffs' claims rely on the claims-administration relationship governed by the Services Agreement, Plaintiffs are estopped from disclaiming the arbitration provision contained in it.

### B. *The Plan and the Services Agreement's Controlled-Group Provision Confirm that Plaintiffs Received the Services Agreement's Direct Benefits.*

Consistent with the estoppel analysis above, the Services Agreement expressly contemplates that the "Customer" and its affiliated employers covered under the Plan together constitute a single "controlled group," and that the Services are provided to Customer "directly or through one of UMR's affiliates." (Services Agreement at 1 & § 6.6). The Plan document confirms the controlled-group structure and refutes Plaintiffs' assertion that AHS is "a wholly separate entity" whose performance under the Services Agreement has no bearing on UMR's obligations. (Am. Compl. at ¶ 26). AHS is the Plan Sponsor, the Plan Administrator, and the Named Fiduciary of the very Plan under which Plaintiffs' employees receive benefits—and for which Plaintiffs allege they paid UMR approximately $24 million. (Ex. 2, Plan at 1–2; Am. Compl. at ¶¶ 24, 27).

Section 6.6 of the Services Agreement, in turn, provides that the Customer and "any of its affiliates covered under the Plan make up a single 'controlled group.'" (Services Agreement § 6.6). Plaintiffs are the affiliated employers whose employees are covered under the AHS Plan and whose claims UMR administered under the Services Agreement. Plaintiffs cannot disclaim the Services Agreement between UMR and AHS while simultaneously suing to recover funds paid to administer the AHS Plan that the Services Agreement governs. The direct benefit Plaintiffs knowingly accepted, UMR's administration of their employees' claims under the AHS Plan, flows directly from the Services Agreement, and Plaintiffs are estopped from disclaiming its arbitration provision. UMR does not contend that Plaintiffs are intended third-party beneficiaries, a status the Services Agreement disclaims. (Services Agreement § 11.10).

## IV. **Once Formation Is Established, the Scope of the Dispute Is for the Arbitrator, and Plaintiffs' Claim Is Arbitrable in Any Event.**

Threshold questions of contract formation and whether Plaintiffs are bound are for the Court to decide. *See Attix*, 35 F.4th at 1294. Once the Court resolves those threshold issues in UMR's favor, however, the scope of the parties' arbitration agreement is committed to the arbitrator. By incorporating the Commercial Arbitration Rules of the AAA, which empower the arbitrator to rule on his or her own jurisdiction, including the existence, scope, or validity of the arbitration agreement, the Services Agreement clearly and unmistakably delegates questions of arbitrability to the arbitrator. *Terminix Int'l Co. v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1332–33 (11th Cir. 2005) (holding that by providing for arbitration in accordance with the AAA rules, the parties "clearly and unmistakably agreed that the arbitrator should decide whether the arbitration clause is valid."); *Attix,* 35 F.4th at 1298 (holding that incorporating the AAA rule empowering the arbitrator "to rule on his or her own jurisdiction" is a "clear and unmistakable delegation of questions of arbitrability," expressly reaffirming *Terminix*); *see* AAA Commercial Rule R-7(a).

In all events, Plaintiffs' claim falls squarely within the arbitration provision, which reaches "any dispute, claim, or controversy of any kind or nature between the Parties arising out of this Agreement or the Services." (Services Agreement at § 9). The parties' disputes arising under the Services Agreement, UMR's administration of claims, the Run Out Claims, funding, and the parties' obligations on termination, fall within Section 9.

## V. **Any Dispute Over the Section 9 Prerequisites Is for the Arbitrator.**

Section 9 contemplates written notice of a Dispute, a meeting of the parties' representatives, and a 30-day period following the first meeting before a party refers the Dispute to arbitration. Such procedural prerequisites do not present questions of arbitrability for the Court;

they are "procedural questions which grow out of the dispute and bear on its final disposition," and are "presumptively *not* for the judge, but for an arbitrator, to decide." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002) (quotation omitted) (emphasis in original) (finding that there is a presumption that arbitrators should decide all questions of waiver, delay, or a like defense to arbitrability, including whether "prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met") (quotation omitted). Whether the parties satisfied, waived, or were excused from complying with the notice-and-negotiation steps in Section 9 is therefore for the arbitrator to decide.

The same principle applies to any contention that the Section 9 prerequisites were satisfied, waived or excused. Those issues are for the arbitrator, not the Court. *BG Grp., PLC v. Republic of Argentina,* 572 U.S. 25, 35-36, 134 S. Ct. 1198, 1207-08, 188 L. Ed. 2d 220 (2014) (procedural preconditions to arbitration, including notice and other conditions precedent, are for the arbitrator, not the court); *Dimattina Holdings, LLC v. Steri-Clean, Inc.*, 195 F. Supp. 3d 1285, 1289 (S.D. Fla. 2016) (whether a party satisfied the contract's pre-arbitration notice requirement before moving to compel "is a matter for an arbitrator to decide").

**VI. UMR Has Not Waived Its Right to Arbitrate.**

The remaining element (no waiver) is satisfied. Waiver is assessed under ordinary principles: the question is whether the party, knowing of its right to arbitrate, acted inconsistently with that right. *Morgan v. Sundance, Inc.*, 596 U.S. 411, 417–19 (2022) (holding that a court may not condition waiver of the right to arbitrate on a showing of prejudice; the FAA bars arbitration-specific procedural rules, so the inquiry is simply whether the party "knowingly relinquish[ed] the right to arbitrate by acting inconsistently with that right."). Courts "may not devise novel rules to favor arbitration over litigation," and no showing of prejudice is required; the inquiry "focus[es]

on the [party's] conduct." *Id.* at 419. The relevant question is whether UMR knowingly relinquished the right to arbitrate by acting inconsistently with that right, such as by "substantially invok[ing] the litigation machinery." *Gutierrez v. Wells Fargo Bank, NA*, 889 F.3d 1230, 1236 (11th Cir. 2018).

UMR has done nothing inconsistent with its arbitration right. Plaintiffs served UMR on August 19, 2026; UMR removed the action within the thirty-day statutory window on August 31, 2026; and UMR now moves to compel arbitration at the outset of the case-before answering, before serving or seeking any discovery, and before litigating the merits. Removal does not waive arbitration: it is a procedural step to bring the action before the federal forum authorized to compel arbitration under 9 U.S.C. § 4, and UMR expressly reserved its arbitration rights in its Notice of Removal. *See Calcaterra v. Baptist Health S. Fla. Inc.,* 733 F.Supp.3d 1349, 1358 (S.D. Fla. 2024) (holding that a defendant that removed the action, continuously asserted its right to arbitrate, and moved to compel before answering did not waive arbitration; removal is not a waiver of the right to compel arbitration). Thus, UMR has not knowingly acted inconsistently with its right to arbitrate.

## VII. <u>The Court Should Stay the Action and Administratively Close the Case Pending Arbitration.</u>

Because the parties' disputes arising under the Services Agreement are subject to arbitration and UMR requests a stay of those disputes, Section 3 of the FAA requires a stay. *Smith v. Spizzirri*, 601 U.S. 472, 476 (2024) (holding that when a dispute is subject to arbitration and a party requests a stay, FAA § 3 compels the court to stay the action, because the statutory command "shall" "creates an obligation impervious to judicial discretion.") (citation omitted). UMR respectfully requests that the Court stay the arbitrable disputes and administratively close the case.

**VIII. <u>In the Alternative, and Without Waiving Arbitration, the Amended Complaint Should be Dismissed Because it Fails to State a Claim.</u>**

Should the Court decline to compel arbitration and instead reach the sufficiency of the pleading, however, UMR submits, in the alternative, and without waiving its right to arbitrate or conceding that the Court should reach the merits, that the Amended Complaint fails to state a claim under Federal Rule of Civil Procedure 12(b)(6). This request is directed to the face of the Amended Complaint and does not rely on matters outside the pleadings. The Amended Complaint pleads a single "count" captioned "Injunctive Relief" and seeks a mandatory injunction ordering UMR to "immediately return $3,531,417.05 of HSA's funds." (Am. Compl. Count I & prayer). That pleading is defective for at least two independent reasons.

**A. *Injunctive Relief is a Remedy, not a Freestanding Cause of Action.***

Count I seeks only injunctive relief; it pleads no substantive claim—no breach of contract, no conversion, no statutory violation—to which that remedy could attach. "[A]ny motion or suit for . . . injunctive relief must be based upon a cause of action," because "there is no such thing as a suit for a traditional injunction in the abstract." *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1127 (11th Cir. 2005) (quotation omitted). An injunction is a remedy available only if the plaintiff establishes a viable underlying cause of action. *Cf. Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1097 (11th Cir. 2004) ("For a traditional injunction to even be theoretically available, a plaintiff must be able to articulate a basis for relief that would withstand scrutiny under [Federal Rule 12(b)(6)."); *Rubinstein v. Keshet Inter Vivos Trust*, No. 17-61019-Civ-Williams/Torres, 2018 WL 3730875, at *7 (S.D. Fla. June 11, 2018) (dismissing a standalone injunctive-relief count as "merely a remedy" premised on the plaintiffs' underlying claims, and noting the "abundance of cases" establishing that injunctive relief is a remedy, not a separate cause of action). Because the Amended Complaint asserts a remedy in search of a claim, it fails on its face.

### B. *Plaintiffs Have an Adequate Remedy at Law, Defeating Any Claim for Equitable Relief.*

Even read charitably as seeking equitable relief, the Amended Complaint fails because Plaintiffs plainly have an adequate remedy at law. Injunctive relief requires the movant to establish, among other elements, the unavailability of an adequate remedy at law, and irreparable harm. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). Plaintiffs seek the return of a specific, liquidated sum of money—$3,531,417.05—and their alleged injuries are compensable in damages. "An injury is 'irreparable' only if it cannot be undone through monetary remedies." *Ne. Fla. Chapter of Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). A suit that is, in substance, a demand for a sum certain cannot be repackaged as a mandatory injunction. Plaintiffs' own allegation that they have already "secure[d] an alternative method to process" their claims (Am. Compl. at ¶ 4) further negates any claim of ongoing irreparable harm.

Separately, and only in the alternative, to the extent Plaintiffs' claim is construed to seek control over the administration of assets of their self-funded ERISA plans, it may be subject to preemption under ERISA § 514(a), 29 U.S.C. § 1144(a); UMR does not press that defense on this Motion but expressly reserves its ERISA-preemption and all other Rule 12 defenses, which in any event present arbitrable merits questions for the arbitrator.

## CONCLUSION

For the foregoing reasons, Defendant UMR, Inc. respectfully requests that the Court (1) compel the parties to arbitrate their disputes arising under the Services Agreement in accordance with Section 9; and (2) stay the parties' arbitrable disputes and administratively close the case pending arbitration; or, in the alternative and without waiving arbitration, dismiss the Amended Complaint; and (3) grant such other relief as is just and proper.

## LOCAL RULE 7.1(a)(3) CERTIFICATION

Pursuant to Local Rule 7.1(a)(3), counsel for UMR certifies that they have conferred via telephone on September 9, 2026, with counsel for Plaintiffs regarding the relief requested in this Motion. Plaintiffs oppose the relief sought.

Dated: September 9, 2026

Respectfully submitted,

*/s/ Irene Bassel Frick*

**Irene Bassel Frick, Esq.**
Florida Bar No.: 0158739
Primary: irene.basselfrick@akerman.com
Secondary: nicole.emmett@akerman.com
**Neema Mathew Monfared, Esq.**
Florida Bar No. 1035991
Primary: neema.monfared@akerman.com
Secondary: marykay.siegel@akerman.com
**AKERMAN LLP**
401 E. Jackson Street, Suite 1700
Tampa, Florida 33602
Telephone (813) 223-7333

**Alexandra M. Mora, Esq.**
Florida Bar Number: 052368
E-mail: alexandra.mora@akerman.com
Secondary E-mail: marylin.herrera@akerman.com
**Scott E. Allbright, Jr.**
Florida Bar No.: 102958
Primary: scott.allbright@akerman.com
Secondary: debra.atkinson@akerman.com
**AKERMAN LLP**
Three Brickell City Centre, Suite 1100
98 SE Seventh Street Miami, Florida 33131
Telephone: (305) 374-5600

**Allison P. Gallagher, Esq.**
Florida Bar No.: 808911
Primary: allison.gallagher@akerman.com
Secondary: nicole.emmett@akerman.com
**AKERMAN LLP**
420 South Orange Avenue, Suite 1200
Orlando, Florida 32801
Telephone: (407) 423-4000
*Counsel for Defendant, UMR, Inc.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed via CM/ECF and served on all persons listed below via CM/ECF on September 9, 2026.

*/s/ Irene Bassel Frick*
Irene Bassel Frick, Esq.
Florida Bar No.: 0158739

**SERVICE LIST**

David Geller, Esq.
Florida Bar No. 28976
david@wvglegal.com
Wahid Vizcaino Geller, PLLC
2103 Coral Way, Suite 401
Miami, FL 33145
(305) 444-4303
(305) 444-4302 Fax
*Counsel for Plaintiffs*