**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

CASE NO. 26-CV-26005-RAR

HSA PGH, LLC d/b/a Palmetto General Hospital;
HSA CGH, LLC d/b/a Coral Gables Hospital;
HSA FMC, LLC d/b/a Florida Medical Center;
HSA NSMC, LLC d/b/a North Shore Medical Center;
HSA HH, LLC d/b/a Hialeah Hospital;
HSA GLENWOOD, LLC d/b/a Glenwood Regional Medical Center;
HSA PORT ARTHUR, LLC d/b/a Medical Center of Southeast Texas;
and HSA ST. JOSEPH, LLC d/b/a St. Joseph Medical Center,

Plaintiffs,

v.

UMR, INC.,

Defendant.

_______________________________________________/

**UMR'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS**[1]

Defendant UMR, Inc. ("UMR") moves under the Federal Arbitration Act (the "FAA"), 9 U.S.C. §§ 3–4, to compel arbitration of the claims asserted in Plaintiffs' Second Amended Complaint ("SAC"), (Doc. 24), and to stay this action pending that arbitration. Plaintiffs' latest artful attempt to avoid the burden of its contract while accepting its benefits fails. The core facts

[1] In the event that the Court denies this Motion, UMR expressly reserves the right to bring a Rule 12 motion to dismiss. *See Baptist Hosp. of Miami, Inc. v. Medica Healthcare Plans, Inc.*, 376 F. Supp. 3d 1298, 1312 (S.D. Fla. 2019) ("The undersigned agrees that if this Court denies Medica's motion to compel arbitration, Medica should be permitted to file a motion to dismiss on the merits pursuant to Rule 12"); *Maglana v. Celebrity Cruises Inc.*, No. 20-22133-CIV, 2023 WL 4926055, at *3 (S.D. Fla. June 30, 2023), *aff'd*, 136 F.4th 1032 (11th Cir. 2025) (" Defendant did not file its original motion to compel arbitration under Rule 12. . . . Instead, the Motion to Compel Arbitration was brought under the Convention Act. Therefore, Plaintiff's Rule 12 argument fails and the Defendant is permitted to file a motion to dismiss for failure to state a claim.").

in Plaintiffs' SAC are unchanged: Plaintiffs are eight hospital entities who accepted UMR's services as the third party administrator of their self-funded health plan and now complain about UMR's actions in relation thereto. UMR provided the at-issue administrative services under the Administrative Services Agreement effective January 1, 2025 between UMR and American Healthcare Systems Corp Inc. ("AHS")—the agreement Plaintiffs call the "ASA" and which this Motion calls the "Services Agreement." Section 9 of the Services Agreement commits to binding arbitration "any dispute, claim, or controversy of any kind or nature between the Parties arising out of this Agreement or the Services," and Section 10.3 provides that Section 9 survives termination. (Declaration of Monica Davis Morris ("Morris Decl.") ¶ 6, Ex. A §§ 9, 10.3).

The SAC is Plaintiffs' second attempt to plead around that provision. In an about face, Plaintiffs now disclaim any reliance on the Services Agreement and recast their claims as independent duties of custody and accounting. That characterization, when reviewed in conjunction with the documents Plaintiffs themselves reference (but do not attach) falls apart. The SAC is premised on the fundamental fact that UMR was administering health claims for Plaintiffs. Plaintiffs, though, would have the Court believe that there was no express agreement pursuant to which UMR was doing so. That is belied by the facts, contradicted by the Services Agreement itself, and inconsistent with the applicable health plan documents. Plaintiffs, in alleging that they are not subject to the arbitration provision in the Services Agreement, detail the termination of their relationship with UMR to argue some type of independent duty or obligation. But even those communications, which Plaintiffs do not attach, from August 2026, expressly reference the Services Agreement. Indeed, not only are the "run-out services" that Plaintiffs were seeking in August 2026, services available under the Services Agreement (which Plaintiffs now disclaim), Plaintiffs never disavowed or disclaimed the application or governance of the Services Agreement.

(Morris Decl. Exs. F, G). In fact, Plaintiffs concede that they partially performed on a proposal by UMR to provide run-out services ***pursuant to the Services Agreement***, and transferred $2,000,000 on August 6, 2026. (Doc. 24 ¶ 47). In sum, the actions of which the Plaintiffs complain squarely fall within the valid written agreement to arbitrate. Because UMR has not waived its right to enforce this provision, the Court should compel arbitration and stay this action.

## BACKGROUND

### I. The Parties' Relationship and Plaintiffs' Allegations

Plaintiffs operate hospitals in Florida, Louisiana, and Texas. (Doc. 24 ¶¶ 12–19). They allege that they "provide self-funded medical benefits for their employees and their employees' families," and that UMR "administered medical claims for the HSA Hospital Plaintiffs," (*Id.* ¶ 2). Plaintiffs admit the existence of the Services Agreement, alleging that it is an "unsigned Administrative Services Agreement between UMR and AHS (the 'ASA')." (*Id.* ¶¶ 35, 36). But Plaintiffs disclaim its application, contending that it "identifies UMR and AHS as the 'Parties' and AHS as the 'Customer,'" that they "are not identified as Parties to the ASA and did not sign it," and that the Services Agreement "confers no rights, remedies, obligations, or liabilities on persons other than the Parties and their permitted successors or assigns." (*Id.* ¶ 36). Plaintiffs admit that AHS and HSA "were related" but that they "maintained and accounted for their claims funding separately" and in 2026 "ownership and control AHS and HSA were disputed." (*Id.* ¶¶ 2, 5, 33). Plaintiffs also carefully acknowledge that the health claims that UMR was administering for them were pursuant to a health plan, *see* SAC ¶ 57, but contend that they are not challenging the claims determinations or seeking to enforce the health plan. As reflected in UMR's first motion to compel arbitration, and supported by the declaration of Monica Morris filed in conjunction with this Motion, AHS employees and HSA employees are participants in the ***same*** health plan: the

American Healthcare Systems Corp. Inc. Group Health Plan (the "Plan") which identifies AHS as the Plan Sponsor, Plan Administrator and Named Fiduciary. (Morris Decl. ¶¶ 8, 12 & Ex. B).

To avoid the requirement to arbitrate, Plaintiffs theorize that there is some type of "custodial" relationship between them and UMR that is apparently unwritten and apparently has no terms other than what Plaintiffs allege in the SAC. Specifically, Plaintiffs point to the fact that there were multiple accounts set up by UMR to fund claims that it was administering for the Plan, including a separate account set up for Plaintiffs. (Doc. 24 ¶¶ 2–3). Plaintiffs allege that for UMR to provide claims administration services, it set up "UMR Inc. C/F Pmt Claims HSA Corp." account ending in 5312, and separately tracked the funding it received, claims paid, adjustments made, and resulting balances" "separately maintained [for] custodial accounts for claims funding associated with AHS Hospitals." (*Id.* at ¶¶ 27, 29, 31). And further, when UMR provided notice of termination of the Services Agreement, it circulated funding balances for the various accounts and identified a balance for Plaintiffs and separate amounts for AHS hospitals. (*Id.* at ¶ 38). Plaintiffs further complain that UMR conditioned the provision of run-out services on the funding of the separately maintained AHS Hospital accounts and demanded that run-out funding be deposited into a single central account from which claims associated with both groups (HSA and AHS) would be paid. (*Id.* ¶ 8). Ultimately, Plaintiffs conclude that they "did not agree to UMR's proposed use of additional HSA funding across both HSA and AHS claims" (*Id.* ¶¶ 41–43, 45, 46) and this litigation was filed.

To further support the theory that UMR allegedly has some independent relationship with Plaintiffs, Plaintiffs allege that they transferred on August 6, 2026, $2,000,000 to UMR's existing HSA Custodial Account ending in 5312, for run-out services but only for administration of HSA employee claims. (*Id.* ¶ 47). The transfer allegedly did not resolve the parties' disagreement over

UMR's proposed conditions, including the proposed cross-group funding arrangement. (*Id.* ¶ 48). On August 14, 2026, Plaintiffs allege that UMR stated that the parties had not reached agreement, treated termination as effective August 1, 2026, and stated that it would process no further HSA claims. (*Id.* ¶ 49).

Plaintiffs, in the SAC, seek return of funds that they contend belong to them, rather than to allow for Plan health claims to be processed and paid, and plead four counts: breach of fiduciary duty (Count I), conversion (Count II), money had and received and restitution (Count III), and declaratory judgment (Count IV). Because each and every count is premised on the services that UMR provided pursuant to the Services Agreement, Plaintiffs must be compelled to arbitration.

## II. The Services Agreement and Its Mandatory Arbitration Provision

The Services Agreement is "effective as of January 1, 2025," and "governs the claims administration and related administrative services UMR is providing to Customer either directly or through one of UMR's affiliates (the 'Services')." (Morris Decl. ¶ 6 & Ex. A at 1). It also contemplates that the Customer's covered affiliated employers participate in the Plan and receive the Services, providing that "Customer and any of its affiliates covered under the Plan make up a single 'controlled group.'" (*Id.* § 6.6). Section 9 of the Services Agreement sets forth a mandatory, two-step dispute-resolution procedure culminating in binding arbitration:

> In the event of any dispute, claim, or controversy of any kind or nature between the Parties arising out of this Agreement or the Services ("Dispute"), a Party may provide written notification of the Dispute to the other Party. . . . If the Dispute is not resolved within 30 days after the Parties first meet to discuss it, and either Party wishes to pursue the Dispute further, that Party will refer the Dispute to binding arbitration.

(*Id.* § 9). Section 10.1 requires UMR (after adequate funding) to provide the run-out Services after termination and provides that the Agreement's Terms and Conditions "will continue to apply to the run-out Services." (*Id.* Ex. A § 10.1). Section 10.3 provides that Section 9, among other

provisions, survives termination. (*Id.* § 10.3). Section 11.13 permits execution in counterparts, including by electronic communication and electronic signature. (*Id.* § 11.13). And Section 11.3 provides that the Services Agreement is governed by New York law. (*Id.* § 11.3).

## III. The Plan, Designated Plan Roles and Plaintiffs' Participation under the Services Agreement.

There is only one self-funded Plan at issue and it covers both AHS employees and HSA employees. The Plan is a single, self-funded employee welfare benefit plan which identifies AHS as the Plan Sponsor, the Plan Administrator, and the Named Fiduciary. (Morris Decl. ¶¶ 8, 11–12 & Exs. B, C). In accord with the Services Agreement, the Plan identifies UMR as the third-party administrator for medical claims. (*Id.*, Exs. B, C). The Plan thus confirms, on its face, that UMR was providing the very claims-administration "Services" described in the Services Agreement for both AHS employees and HSA employees notwithstanding Plaintiffs attempts to distance themselves from AHS and argue the existence of some type of independent relationship with UMR.

## IV. HSA's Acceptance, UMR's Performance, and the Parties' August 2026 Run-Out Discussions.

UMR and AHS entered into the Services Agreement effective January 1, 2025 for UMR to administer health claims for the self-funded plan AHS sponsored for its employees. (Morris Decl. ¶ 6). Effective April 1, 2025, HSA was added to that account as a reported affiliate of AHS; no separate administrative services agreement was entered into between HSA and UMR, and the existing Services Agreement continued to apply. (*Id.* ¶ 9). Plaintiffs are subsidiaries of HSA, and the Plan carries a single group number, with separate plan numbers for AHS and HSA because UMR's services commenced on two different effective dates. (*Id.* ¶ 14). Under the Services Agreement, UMR opened and maintained bank accounts to pay Plan benefits, Plan expenses, other customer financial obligations, and authorized Fees, and one such account was established for the

HSA hospitals. (*Id.* ¶ 13). Plaintiffs, through their authorized representatives, provided UMR with employee-eligibility information, funded that account, and accepted UMR's services for their employees and dependents. (*Id.* ¶ 15).

On June 1, 2026, UMR issued a written termination notice quoting Sections 10.2(4) and 10.2(5) of the Services Agreement and stating that the Services Agreement would terminate "at the end of business on Tuesday, June 30, 2026." (*Id.* ¶ 17, Ex. D). The notice was delivered to the chief executive officer and to other personnel whom it identifies as serving both AHS and HSA Hospitals, including several individuals at "hsahospitals.com;" no one responded asserting that the Services Agreement did not govern UMR's services. (*Id.*). On June 3, 2026, at Plaintiffs' request, UMR granted a thirty-day extension of the termination date to August 1, 2026. (*Id.* ¶ 18, Ex. E). UMR did not terminate on the original June 30, 2026 date, and its services continued until August 1, 2026. (*Id.* ¶¶ 18–19).

After termination of the Services Agreement and on the subject of run-out services, on August 4, 2026, UMR sent a letter addressed jointly to AHS, attention Mike Sarian, CEO, and to "Healthcare Systems of America ATTN: Faisal Gill, CEO," transmitted by email to Mr. Gill at fgill@hsahospitals.com (who were understood to be the principals of AHS and HSA). (*Id.* ¶¶ 20–21, Exs. F, G). The letter identified the Services Agreement by name, parties, and January 1, 2025 effective date; confirmed that it had "been terminated effective August 1, 2026"; confirmed agreement to provide run-out services based on certain conditions, including that "Customer agrees to provide funding of $2 Million per week beginning 8/06/2026"; and stated that "**All terms and conditions of the ASA will continue to apply to the run-out services**." (*Id.* Ex. F (emphasis added)). That same evening, Mr. Gill replied from fgill@hsahospitals.com: "As discussed, HSA is committing to paying $2 million per week." (*Id.* Ex. G). The following day, UMR confirmed

that, in consideration of his agreement to be solely responsible for the terms of run-out, it would move forward with providing run-out services. Subsequently, Mr. Gill backtracked and stated: "Just to be clear the $2 million dollars is for HSA Claims and HSA Claims only." (*Id.*). On August 6, 2026, UMR received $2,000,000 into the applicable bank account. (Doc. 24 ¶ 47 (alleging transfer of the funds)).

**APPLICABLE LEGAL STANDARD**

Section 2 of the FAA provides that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. That provision reflects "both a liberal federal policy favoring arbitration, and the fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quotation omitted). The Services Agreement evidences such a transaction—a national third-party administrator providing claims-administration services to hospitals across Florida, Louisiana, and Texas—so the FAA applies. *See Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1370 (11th Cir. 2005).

"Before enforcing an arbitration agreement, the court should ensure that the agreement was formed and that it applies to the dispute at hand." *Attix v. Carrington Mortg. Servs., LLC*, 35 F.4th 1284, 1294 (11th Cir. 2022). Under the FAA, a district court must compel arbitration if (1) a valid written agreement to arbitrate exists, (2) an arbitrable issue exists, and (3) the right to arbitrate has not been waived. *See Integrated Sec. Servs. v. Skidata, Inc.*, 609 F. Supp. 2d 1323, 1324 (S.D. Fla. 2009). "[T]he burden is on the party opposing arbitration to prove to the court that arbitration is improper." *Dimattina Holdings, LLC v. Steri-Clean, Inc.*, 195 F. Supp. 3d 1285, 1288 (S.D. Fla.

2016) (quotation omitted). Because a motion to compel arbitration is treated as a motion to dismiss for lack of subject matter jurisdiction, "the Court may consider matters outside the four corners of the complaint." *Calcaterra v. Baptist Health S. Fla., Inc.*, 733 F. Supp. 3d 1349, 1353 (S.D. Fla. 2024).

The Eleventh Circuit applies "a summary judgment-like standard . . . in determining whether a trial is necessary under § 4 [of the FAA]," under which "a court may conclude as a matter of law that parties entered into an arbitration agreement only if 'there is no genuine dispute as to any material fact' concerning the formation of the arbitration agreement," and "[w]hen there is no such dispute, a trial is unnecessary." *Larsen v. Citibank FSB*, 871 F.3d 1295, 1308 (11th Cir. 2017). Allegations in a pleading are not evidence capable of creating such a dispute; a party opposing arbitration must substantiate its denial with evidence. *See* 9 U.S.C. § 4; *Flores v. Lower E. Side Serv. Ctr., Inc.*, 4 N.Y.3d 363, 370–71 (2005) (granting summary judgment on contractual indemnification claim where the party resisting an unsigned written contract "failed to come forward with evidence to present a triable dispute concerning the existence of an enforceable written contract").

**DISCUSSION**

Questions of contract formation and who is bound by an arbitration agreement are resolved under state law. *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630–31 (2009). Sitting in diversity, this Court applies the choice-of-law rules of the forum state, Florida. *Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007). "Generally, Florida enforces choice-of-law provisions unless the law of the chosen forum contravenes strong public policy." *Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.*, 761 So. 2d 306, 311 (Fla. 2000). No such policy is implicated here. The Services Agreement provides that it "is governed by,

construed and enforced in accordance with the laws of the State of New York." (Morris Decl., Ex. A § 11.3). New York substantive law therefore governs formation and enforceability. Florida law is in accord on each point addressed below and furnishes an independent, alternative basis for the same result.

## I. A Valid, Written Agreement to Arbitrate Exists and Is Enforceable Notwithstanding That It Is Unsigned.

### A. Neither the FAA nor New York Law Requires a Signed Agreement.

The FAA requires only that an arbitration agreement be "written"; it contains no signature requirement. 9 U.S.C. § 2; *see Caley*, 428 F.3d at 1368 ("[W]hile the FAA requires that the arbitration agreement be in writing, it does not require that it be signed by the parties."). New York law is the same. *Flores*, 4 N.Y.3d at 368 ("[A] contract may be valid even if it is not signed by the party to be charged, provided its subject matter does not implicate a statute—such as the statute of frauds . . . —that imposes such a requirement.") In the arbitration context specifically, "[t]here is no requirement that the writing be signed so long as there is other proof that the parties actually agreed on it." *Crawford v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 35 N.Y.2d 291, 299 (1974) (quotation omitted). Formation instead turns on "the objective manifestations of the intent of the parties as gathered by their expressed words and deeds," with emphasis placed not "on any single act, phrase or other expression, but, instead, on the totality of all of these, given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain." *Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 41 N.Y.2d 397, 399–400 (1977).

### B. The Parties' Course of Performance Manifests Assent to the Services Agreement and Its Arbitration Clause.

The New York Court of Appeals has "reiterate[d] [its] long-standing rule that an arbitration clause in a written agreement is enforceable, even if the agreement is not signed, when it is evident that the parties intended to be bound by the contract." *God's Battalion of Prayer Pentecostal*

*Church, Inc. v. Miele Assocs., LLP*, 6 N.Y.3d 371, 373 (2006). Likewise, a party that retains an unsigned contract containing an arbitration clause and accepts performance over a period of months "[becomes] bound by all the terms of the 'contract', including the arbitration provision." *Burma Bibas, Inc. v. Toyoshima & Co.*, 60 A.D.2d 554, 555 (1st Dep't 1977). Here, UMR and AHS entered into the Services Agreement and UMR performed the Services it prescribes, and when HSA was added to the account effective April 1, 2025, no separate agreement was made and the existing Services Agreement continued to apply. (Morris Decl. ¶¶ 9, 12). Plaintiffs, for their part, supplied employee-eligibility information, funded the applicable account, and accepted the Services. (*Id.* ¶ 15). When UMR terminated, it did so by written notice quoting Sections 10.2(4) and 10.2(5) of the Services Agreement, delivered directly to the chief executive officer and other responsible personnel, and no recipient responded that the Services Agreement did not govern UMR's services. (*Id.* ¶ 17 & Ex. D). No separate services agreement was ever entered into between HSA and UMR; the existing Services Agreement continued to apply. (*Id.* ¶ 9).

Plaintiffs' own pleadings confirm this fact. Plaintiffs allege that UMR administered their medical claims; that claims funding was periodically transferred to UMR; that UMR accepted those payments, and used them to pay HSA claims. (Doc. 24 ¶¶ 2, 26, 27, 30, 31, 40).[2] Florida law is in accord and supplies an independent basis for the same result. *See Integrated Health Servs. of Green Briar, Inc. v. Lopez-Silvero*, 827 So. 2d 338, 339 (Fla. 3d DCA 2002) ("A contract is binding, despite the fact that one party did not sign the contract, where both parties have performed under the contract.").

---

[2] Plaintiffs' superseded Amended Complaint alleged the relationship still more directly, pleading that "UMR and HSA entered into an agreement whereby UMR agreed to provide the administrative processing services for those claims to HSA and their employees," that UMR "acted as third-party administrator," and that HSA "paid UMR approximately $24,000,000.00" under that relationship. (Am. Compl. ¶¶ 19, 25, 27).

### C. Plaintiffs Agreed in Writing That the Services Agreement's Terms, Including Section 9, Would Govern UMR's Run-Out Services.

The SAC's new Section E is a transparent attempt to eschew the very agreement under which Plaintiffs sued and referenced in their original pleading. It does not answer, and does not attempt to answer, the independent and dispositive point that Plaintiffs themselves agreed in writing in August 2026 that **the Services Agreement's terms and conditions would govern the run-out services they demanded**. (Morris Decl. ¶¶ 20–21, Exs. F, G). The run-out obligation is a term of the Services Agreement. Section 10.1 provides that "UMR shall provide the run-out Services set forth in an active Exhibit attached hereto after the termination of the Agreement," and that "[t]he Parties agree that these Terms and Condition will continue to apply to the run-out Services." (*Id.* Ex. A § 10.1). Section 10.3 provides that Section 9 survives termination. (*Id.* § 10.3). The August 4, 2026 letter's statement that "[a]ll terms and conditions of the ASA will continue to apply to the run-out services" therefore did not create a new obligation. (Morris Decl. ¶ 20, Ex. F). It restated the obligation that Section 10.1 already imposed, and it placed the recipients on unambiguous written notice of that fact.

The communications from Plaintiffs simply confirm that the parties were all traveling under the Services Agreement. To confirm the provision and payment for run-out services, Mr. Gill stated: "As discussed, **HSA is committing** to paying $2 million per week [to fund run-out services]." (*Id.* Ex. G (emphasis added)). Under New York law, that is an objective confirmation that the parties are governed and bound by the Services Agreement, "gathered by [the parties'] expressed words and deeds." *Brown Bros.*, 41 N.Y.2d at 399.

Plaintiffs subsequently followed through; Plaintiffs allege that "on August 6, 2026, [] $2,000,000 [was transferred] from its depository account to UMR's existing HSA Custodial Account ending in 5312, and UMR received the transfer." (Doc. 24 ¶ 47). Plaintiffs thus concede

that they transferred funds to UMR for the run-out processing of Plan claims under the Services Agreement.

Plaintiffs, however, ultimately try and explain away their actions by alleging in paragraph 48 of the SAC, that "[t]he parties did not reach agreement on UMR's proposed run-out conditions, including the proposed cross-group funding arrangement." That allegation, however, does not defeat this Motion. Even if there was no agreement reached that HSA would fund all of the Plan's run-out claims, the parties arrived at this point because they were all performing and acting under the Services Agreement. UMR expressly referenced the Services Agreement in its communications with Plaintiffs and Plaintiffs never protested or asserted that the Services Agreement did not apply/govern. A party opposing arbitration must substantiate its denial of formation **with evidence** rather than rest on its complaint. *See* 9 U.S.C. § 4; *Larsen*, 871 F.3d at 1308; *Flores*, 4 N.Y.3d at 370–71. No such evidence exists. In fact, the evidence, including the Services Agreement, the Plan documents, and the communications between the parties all support the opposite conclusion – that all parties believed that they were acting within the scope of the Services Agreement. Unarguably, a dispute currently exists over how funds that the Plaintiffs have deposited should be applied; this is precisely a "dispute, claim, or controversy of any kind or nature between the Parties arising out of this Agreement or the Services." (*Id.* Ex. A § 9).[3]

## II. Plaintiffs' Characterization of Their Claims Does Not Defeat Formation.

The newly pleaded disclaimers in Section E of the SAC are addressed to the legal theory of Plaintiffs' claims, not to the historical facts that establish formation. Plaintiffs may plead their

[3] In essence, Plaintiffs' operative theory is that two sophisticated parties were operating without any written agreement dictating the terms of the arrangement covering highly personal health care coverage across multiple years. And without any such written agreement, HSA nevertheless committed to funding its multi-million dollar obligations.

causes of action as they choose. What they may not do is disclaim, by characterization, a written agreement they made and performed. First, the allegations do not deny the August 4–5, 2026 exchange or the August 6, 2026 payment. To the contrary, paragraph 47 pleads the payment. (Doc. 24 ¶ 47). A party's label for its cause of action cannot unmake an agreement its own pleading describes. Second, Plaintiffs' reliance on the Services Agreement's no-third-party-beneficiary clause is misplaced. (*Id.* ¶ 36). UMR does not contend that Plaintiffs are intended third-party beneficiaries, and Section 11.10 does not speak to the question presented here: **whether a person who separately and expressly agrees in writing that an agreement's terms will govern services rendered to it is bound by that agreement**. Section 11.10 limits rights the instrument confers on strangers to it. It does not immunize a party from a commitment that party made.

Analysis of each of Plaintiffs' causes of action confirms that Plaintiffs are actually complaining about the services that UMR was providing under the Services Agreement and thus trigger the arbitration provision. Plaintiffs allege in Count I, for breach of fiduciary duty, that UMR should have handled the funds that Plaintiffs deposited with it differently. (Doc. 24 ¶ 68). But for the Services Agreement, UMR would have no obligation to accept and process any funds from the Plaintiffs. Next, Plaintiffs characterize, in Count II, UMR's retention of the funds Plaintiffs deposited with it as a conversion. But again, UMR has obligations to process those funds in accordance with Services Agreement. Third, Plaintiffs plead Count III for "Money Had and Received/Restitution" in the alternative; but it is a repackaging of the prior counts complaining about UMR's acceptance of funds to process claims under the Services Agreement. Like Counts I and II, Count III incorporates paragraphs 1 through 61, which are all predicated on the parties relationship for UMR to provide claims administration services ***under the Services Agreement***. Finally, Plaintiffs' request for a declaration, in Count IV, of UMR's "authority, if any, to retain

any residual after HSA claims, fees, and other properly chargeable amounts are accounted for" (*id.*, Request for Relief ¶ g) cannot be adjudicated without construing the Services Agreement's Fee, funding, offset, reconciliation, and termination provisions. As the New York Court of Appeals put it, a party "may not pick and choose which provisions suit its purposes." *God's Battalion*, 6 N.Y.3d at 374.

**III. Plaintiffs Are Bound Under New York Direct-Benefits Estoppel.**

Separate from the August 2026 exchange in which the Plaintiffs directly acknowledge that they are parties to and governed by the Services Agreement, Plaintiffs are also bound under New York's direct-benefits estoppel doctrine. Ordinary principles of state contract law allow a non-signatory to be compelled to arbitrate, *Arthur Andersen*, 556 U.S. at 631, and New York recognizes estoppel among those principles. A non-signatory "may be compelled to arbitrate where the nonsignatory 'knowingly exploits' the benefits of an agreement containing an arbitration clause, and receives benefits flowing directly from the agreement." *Belzberg v. Verus Invs. Holdings Inc.*, 21 N.Y.3d 626, 630–31 (2013) (quotation omitted). "The guiding principle is whether the benefit gained by the nonsignatory is one that can be traced directly to the agreement containing the arbitration clause." *Id.* at 633. Where a party "failed to object to the Agreement when it received it and offer[ed] no persuasive reason for its inaction," and knowingly accepted the agreement's benefits, it is estopped from denying its obligation to arbitrate. *Id.* at 632 (discussing *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1064 (2d Cir. 1993)).

Unlike the non-signatory in *Belzberg*, whose claimed benefit the Court found "too attenuated" because it flowed from his relationship with a third party rather than from the arbitration-bearing agreement, *id.* at 635, the benefits Plaintiffs accepted trace directly to the Services Agreement. UMR adjudicated and paid their employees' claims from the bank account that the Services Agreement required UMR to open and maintain, and Plaintiffs supplied the

eligibility information and funding that made those payments possible. (Morris Decl. ¶¶ 13, 15). Personnel serving the HSA hospitals received the June 1, 2026 termination notice quoting Sections 10.2(4) and 10.2(5), and UMR is aware of no response asserting that the Services Agreement was unknown or inapplicable. (Morris Decl. ¶ 17, Ex. D). HSA's CEO then received UMR's run-out offer, which expressly referenced and incorporated the Services Agreement to those services, and HSA's CEO unequivocally accepted. (*Id.* ¶¶ 20–21, Exs. F, G). Having knowingly accepted those direct benefits without objection, Plaintiffs are estopped from disclaiming the arbitration provision contained in the same instrument. Thus, UMR does not contend that Plaintiffs are intended third-party beneficiaries. (*Id.* Ex. A § 11.10).

**IV. The Dispute Falls Within Section 9, and Any Dispute Over Its Procedural Prerequisites Is for the Arbitrator.**

Section 9 reaches "any dispute, claim, or controversy of any kind or nature between the Parties arising out of this Agreement or the Services." (Morris Decl., Ex. A § 9). The clause has two independent prongs. Even if a claim were thought not to arise out of the Agreement, it plainly arises out of "the Services"—the claims administration and related administrative services the Services Agreement governs. (*Id.* at 1). Each count turns on those Services and on the money HSA transferred into the Services Agreement bank account through which they were performed. Count I alleges that UMR assumed duties by "accepting custody and control of money entrusted to it," including duties of "applying them only for authorized purposes, accounting for their disposition, [and] refraining from reallocating them contrary to the directions governing their use." (Doc. 24 ¶¶ 64, 65). Count II alleges that after termination UMR's "authority to retain or use any residual HSA claims funding was limited to claims, fees, and other amounts properly chargeable against the HSA Custodial Account." (*Id.* ¶ 77). Count III alleges that UMR has no equitable entitlement to retain residual funding "for which it provided no corresponding claims payment, service,

authorized offset, or other value." (*Id.* ¶ 89). And Count IV asks the Court to declare UMR's "authority, if any, to retain, transfer, reallocate, or apply that funding." (*Id.* ¶ 98).

What is "properly chargeable," what constitutes an "authorized purpose," what offsets and reallocations are permitted, and what residual is owed upon termination **are questions answered by the Services Agreement's Fee, funding, offset, reconciliation, and termination provisions**. (Morris Decl., Ex. A §§ 2–4, 10.1). These disputes arise out of the Agreement and out of the Services, and they fall within Section 9.[4]

**V. UMR Has Not Waived Its Right to Arbitrate and the Court Must Stay This Action.**

The final element is satisfied. Waiver is assessed under ordinary principles. The question is whether UMR knowingly relinquished the right by acting inconsistently with it, such as by "substantially invok[ing] the litigation machinery prior to demanding arbitration." *Gutierrez v. Wells Fargo Bank, NA*, 889 F.3d 1230, 1236 (11th Cir. 2018) (quotation omitted). UMR has done nothing of the kind. Plaintiffs served UMR on August 19, 2026; UMR removed within the statutory window on August 31, 2026, expressly reserving its arbitration rights; UMR moved to compel arbitration on September 9, 2026, before answering, before serving or seeking any discovery, and before litigating the merits; and UMR renews that motion now, directed to the operative pleading, at the first opportunity. Removal does not waive arbitration. *See Calcaterra*, 733 F. Supp. 3d at

[4] Any procedural prerequisites do not present questions of arbitrability for the Court. They are "'procedural' questions which grow out of the dispute and bear on its final disposition," and are "presumptively not for the judge, but for an arbitrator, to decide." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002) (quotation omitted). So too for "whether prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met." *Id.* at 85 (quotation omitted); *accord BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 34–35 (2014); *Dimattina Holdings*, 195 F. Supp. 3d at 1289–90 (whether a party satisfied a contractual pre-arbitration notice requirement before moving to compel "is a matter for an arbitrator to decide").

1358 (defendant that removed, continuously asserted its right to arbitrate, and moved to compel before answering did not waive arbitration).

As to the stay, Section 3 of the FAA provides that when an issue in a suit is referable to arbitration, the court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration." 9 U.S.C. § 3. Accordingly, "[w]hen a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding." *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024). UMR so applies.[5]

**CONCLUSION**

UMR therefore requests that the Court compel arbitration of the claims pleaded in the SAC, stay this action pending the completion of that arbitration, and administratively close the case pending further order of the Court.

Dated: October 23, 2026

Respectfully submitted,

*<u>/s/ Irene Bassel Frick</u>*

**Irene Bassel Frick, Esq.**
Florida Bar No.: 0158739
Primary: irene.basselfrick@akerman.com
Secondary: nicole.emmett@akerman.com
**Neema Mathew Monfared, Esq.**
Florida Bar No. 1035991
Primary: neema.monfared@akerman.com
Secondary: marykay.siegel@akerman.com
**AKERMAN LLP**
401 E. Jackson Street, Suite 1700
Tampa, Florida 33602
Telephone (813) 223-7333

[5] UMR is also not in default in proceeding with arbitration; it has demanded arbitration and moved to compel at the first opportunity. A stay also works no prejudice to Plaintiffs, because it preserves the parties' ability to return to this Court should arbitration break down or fail to resolve the dispute. *Id.* at 477.

**Scott E. Allbright, Jr.**
Florida Bar No.: 102958
Primary: scott.allbright@akerman.com
Secondary: debra.atkinson@akerman.com
**AKERMAN LLP**
Three Brickell City Centre, Suite 1100
98 SE Seventh Street Miami, Florida 33131
Telephone: (305) 374-5600

**Allison P. Gallagher, Esq.**
Florida Bar No.: 808911
Primary: allison.gallagher@akerman.com
Secondary: nicole.emmett@akerman.com
**AKERMAN LLP**
420 South Orange Avenue, Suite 1200
Orlando, Florida 32801
Telephone: (407) 423-4000

*Counsel for Defendant, UMR, Inc.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed via CM/ECF and served on all parties listed below via CM/ECF on October 23, 2026.

*/s/ Irene Bassel Frick*
**Irene Bassel Frick, Esq.**
Florida Bar No.: 0158739

**SERVICE LIST**

David Geller, Esq.
Florida Bar No.: 28976
david@wvglegal.com
Wahid Vizcaino Geller, PLLC
2103 Coral Way, Suite 401
Miami, FL 33145
(305) 444-4303 Telephone
(305) 444-4302 Fax
*Counsel for Plaintiffs*