**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 26-CV-26005-RAR**

HSA PGH, LLC d/b/a Palmetto General Hospital;
HSA CGH, LLC d/b/a Coral Gables Hospital;
HSA FMC, LLC d/b/a Florida Medical Center;
HSA NSMC, LLC d/b/a North Shore Medical Center;
HSA HH, LLC d/b/a Hialeah Hospital;
HSA GLENWOOD, LLC d/b/a Glenwood Regional Medical Center; HSA PORT ARTHUR, LLC d/b/a Medical Center of Southeast Texas; and HSA ST. JOSEPH, LLC d/b/a St. Joseph Medical Center,

Plaintiffs,

v.

UMR, INC.,

Defendant.
_______________________________________/

**UMR'S REPLY IN SUPPORT OF ITS**
**MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS**

Defendant UMR, Inc. ("UMR") replies in support of its Motion to Compel Arbitration and Stay Proceedings (Doc. 28) (the "Motion") and in response to Plaintiffs' Opposition (Doc. 38).

## INTRODUCTION

In the Second Amended Complaint (Doc. 24) (the "SAC"), Plaintiffs allege that UMR received millions to perform claims administration services and that it currently retains $3.53 million. (Doc. 24 ¶ 10.) In their Opposition, however, Plaintiffs claim that there is no contract that governs the relationship. The record says otherwise, and Plaintiffs offer nothing to contradict it.

UMR supported its Motion with sworn testimony and the governing documents. (Doc. 29.) Plaintiffs answered with no declaration, no competing contract, and one exhibit: UMR's August 14, 2026 termination letter. (Doc. 38-1.) They "do not dispute that they agreed to receive claims-administration services." (Doc. 38 at 5.) Indeed, in an affidavit filed to initiate this litigation, Plaintiffs' CEO, Faisal Gill, swore in state court that UMR and the Plaintiff hospitals "entered into an agreement" for those services. (Doc. 1 at 51–52, Gill Aff. ¶¶ 3, 5, 7.) Thus, the only dispute is: which "agreement" governing the relationship was "entered into" between the parties?

There is only one answer—the Administrative Services Agreement (the "Services Agreement") between UMR and American Healthcare Systems Corp. Inc. ("AHS"). It is the only instrument in the record that defines the terms pursuant to which UMR was providing claims administration services and specifically the fees Plaintiffs paid and the account they funded. Indeed, despite arguing against the applicability of the Services Agreement, Plaintiffs never identify any alternative agreement that could possibly govern. Argument from counsel cannot create a genuine dispute where the sworn record leaves none. Because the Services Agreement governs, and Section 9 of the Services Agreement commits to arbitration "any dispute, claim, or controversy of any kind or nature between the Parties arising out of this Agreement or the

Services," (Doc. 29-2 Ex. A § 9), the Court should compel arbitration of the claims in the SAC and stay this action.

## DISCUSSION

### I. UMR Carried Its Burden, and Argument from Counsel Cannot Create a Genuine Dispute About Contract Formation.

Plaintiffs first contend that UMR shifted to them the burden of disproving an agreement to arbitrate. (Doc. 38 at 3–4.) That's correct; UMR bears the burden (which it carried) of proving an agreement to arbitrate. *See Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1330 (11th Cir. 2016); *Dimattina Holdings, LLC v. Steri-Clean, Inc.*, 195 F. Supp. 3d 1285, 1288 (S.D. Fla. 2016). Courts apply "a summary judgment-like standard" when evaluating a motion to compel arbitration under the Federal Arbitration Act. *Larsen v. Citibank FSB*, 871 F.3d 1295, 1308 (11th Cir. 2017). Under that standard, a dispute is not genuine "if it is unsupported by the evidence," and "conclusory allegations without specific supporting facts have no probative value." *Bazemore*, 827 F.3d at 1333 (quotations omitted). Thus, the Eleventh Circuit has reversed denials of motions to compel where the movant's "uncontroverted evidence" met its burden, *Larsen*, 871 F.3d at 1307–08, and where the opponent "offered nothing in rebuttal" to a sworn declaration attaching the contract, *Lamonaco v. Experian Info. Sols., Inc.*, 141 F.4th 1343, 1349 (11th Cir. 2025). New York law is the same. *Flores v. Lower E. Side Serv. Ctr., Inc.*, 4 N.Y.3d 363, 370–71 (2005) (granting summary judgment where party resisting unsigned contract "failed to come forward with evidence to present a triable dispute").

Here, UMR met its burden. Monica Davis Morris, UMR's Director of Account Management and the person responsible for the account since January 2025, testified under penalty of perjury and attached the Services Agreement, the plan documents, and the parties' correspondence. (Doc. 29-1 ¶¶ 1–6, 9–21 & Docs. 29-2 – 29-8 Exs. A–G.) Among other things,



89323701;8

Ms. Morris testified that when Healthcare Systems of America Corp., Inc. ("HSA"), Plaintiffs' parent (Doc. 13 ¶ 11 ("Healthcare Systems of America Corp. . . . is the sole member of Healthcare Systems of America-Florida, LLC, Healthcare Systems of America-Louisiana, LLC, and Healthcare Systems of America-Texas, LLC. Those three are in turn the members of the eight HSA Plaintiffs.")), joined the account, "[n]o separate administrative services agreement was entered into between HSA and UMR, and the existing Services Agreement continued to apply" (Doc. 29-1 ¶ 9), and that Plaintiffs, "through their authorized representatives," supplied eligibility information, funded the account, and accepted UMR's services. (*Id.* ¶ 15.) Plaintiffs have offered nothing to rebut Ms. Morris's testimony. Tellingly, while Mr. Gill swore an affidavit in state court when Plaintiffs sought "emergency" injunctive relief, he submitted nothing here.[1]

Nor does *Bazemore* help Plaintiffs. The movant there had no copy of the agreement and no evidence that it was sent, 827 F.3d at 1331–32; here, the Services Agreement is in the record, and every notice invoking it went to Plaintiffs' CEO. (Docs. 29-5, 29-7, & 29-8 Exs. D, F, G.)

**II. The Unrebutted Record Shows That Plaintiffs Adopted the Services Agreement.**

Under New York law, formation turns on "the objective manifestations of the intent of the parties as gathered by their expressed words and deeds," viewed in their "totality." *Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 41 N.Y.2d 397, 399–400 (1977). An arbitration clause in an unsigned agreement is enforceable "when it is evident that the parties intended to be bound by the contract." *God's Battalion of Prayer Pentecostal Church, Inc. v. Miele Assocs., LLP*,

[1] UMR's showing does not depend on any superseded pleading. (*See* Doc. 38 at 5 n.2.) Mr. Gill's notarized affidavit, (Doc. 1 at 57), is sworn evidence, not a pleading, so the SAC did not supersede it. *See, e.g.*, *Cassady v. Walker*, No. 09-cv-128, 2012 WL 899913, at *1 n.3 (S.D. Ga. Feb. 6, 2012) ("Moreover, while the original complaint was superseded as the operative pleading, and therefore does not control which claims are at issue in this action, it is still a signed statement of facts equivalent to an affidavit with respect to factual matters within [P]laintiff's personal knowledge" (quotation omitted, collecting cases)), *adopted* 2012 WL 899200 (S.D. Ga. Mar. 15, 2012).

6 N.Y.3d 371, 373 (2006). And "[i]n the absence of a signature, a party may be bound by an arbitration clause if its subsequent conduct indicates that it is assuming the obligation to arbitrate." *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 777 (2d Cir. 1995).[2]

### A. The Affiliate Provisions and Section 11.10 Explain the Joinder; They Do Not Defeat It.

Plaintiffs argue that the Services Agreement distinguishes covered affiliates from the "Parties," limits arbitration to disputes "between the Parties," and disclaims obligations to anyone else in Section 11.10. (Doc. 38 at 4.) UMR does not contend that affiliate status alone binds Plaintiffs, or that Plaintiffs are third-party beneficiaries. (*See* Doc. 28 at 14.) But the Services Agreement defines "Employee" to include an employee "of Customer or its affiliated employer," and it treats AHS, the "Customer," and "any of its affiliates covered under the Plan" as a single "controlled group." (Doc. 29-2 Ex. A §§ 1, 6.6.) Plaintiffs concede that these provisions "explain why UMR administered Plaintiffs' employees' claims" (Doc. 38 at 4); they also explain why HSA could join the existing account on April 1, 2025, without a new contract, with HSA employees added to the same health plan (the "Plan") under the same group number. (Doc. 29-1 ¶¶ 9, 11–12, 14 & Doc. 29-4 Ex. C.) Plaintiffs plead that the HSA and AHS hospital groups are "related" (Doc. 24 ¶ 2), and the record bears that out. The same executive, Mike Sarian, served as CEO of AHS and as President of HSA and Chairman and CEO of each Florida Plaintiff (Doc. 1 at 150, 162, 702). AHS's Jonathan Burket was an authorized signatory on the Florida Plaintiffs' operating accounts, and Plaintiffs' counsel represented him in the dispute over control of those accounts

---

[2] Plaintiffs identify no conflict between New York and Florida law on these questions. (*See* Doc. 38 at 3 n.1.) Because Plaintiffs contend that the result is the same under either State's law, the Court need not decide whether Section 11.3 of the Services Agreement binds Plaintiffs of its own force. Florida likewise recognizes that a "non-signatory may be bound to arbitrate under certain circumstances," including "assumption." *Carfagna v. Fisher Island Club, Inc.*, 796 F. Supp. 3d 1134, 1143 (S.D. Fla. 2025).

(Doc. 1 at 147, 392; Docs. 29-3 at 6 & 29-4 at 6). The affiliate provisions supplied the mechanism of joinder; Plaintiffs' later conduct shows that they took on the Customer's role.

Section 11.10 does not change the analysis. It provides that "[n]othing in this Agreement confers upon any person other than the Parties" any "rights, remedies, obligations, or liabilities whatsoever." (Doc. 29-2 Ex. A § 11.10.) That provision limits what the instrument itself confers on strangers; it does not prevent an entity from becoming bound by assuming the agreement through its own conduct, a distinct theory. *Thomson-CSF*, 64 F.3d at 776–77 (no assumption where the nonsignatory "explicitly disavowed" the agreement); *see Belzberg v. Verus Invs. Holdings Inc.*, 21 N.Y.3d 626, 630 n.3 (2013). Plaintiffs' argument that Section 9 and the survival clauses reach only "the Parties" (Doc. 38 at 4, 8–9) likewise assumes its conclusion: if Plaintiffs adopted the Services Agreement by conduct, they are bound by its terms, and Sections 10.1 and 10.3 carry those terms past termination. Nor does it matter that UMR "could have" obtained a separate writing. (Doc. 38 at 6.) New York law requires no signature when conduct shows an intent to be bound. *God's Battalion*, 6 N.Y.3d at 373–74; *Flores*, 4 N.Y.3d at 368–69.

### B. Plaintiffs Performed the Customer's Obligations and Invoked the Services Agreement.

Plaintiffs next argue that supplying eligibility data and claims funding is consistent with mere Plan participation, and that their silence after the June 1, 2026 termination notice is not assent. (Doc. 38 at 5–7.) The record shows far more. The Services Agreement defines the "Bank Account" as the account for "Plan benefits, expenses, Fees, and other Customer financial obligations," and defines "Fee" as compensation that "Customer pays to UMR for Services provided under this Agreement." (Doc. 29-2 Ex. A § 1.) AHS and HSA chose to set up a single account for HSA's hospitals, one of "the various bank accounts under the Services Agreement." (Doc. 29-1 ¶¶ 13, 16.) Plaintiffs funded it and supplied eligibility information, the Customer's functions. (*Id.* ¶ 15;

Doc. 29-2 Ex. A §§ 1, 6.4 (heading: "Information Customer Provides to UMR").) Mr. Gill swore that, since January 2026, the Plaintiff hospitals paid UMR approximately $24 million "for employee health benefit claims and UMR administrative fees." (Doc. 1 at 52, Gill Aff. ¶ 7.) Plaintiffs identify no other instrument that defines those fees or governs that account. Their nonsensical theory requires the Court to accept that sophisticated hospital operators handed UMR some $24 million **with no governing terms at all**.[3]

Plaintiffs' efforts to distinguish UMR's authorities (Doc. 38 at 5–6) fail for the same reason. In *God's Battalion*, the party opposing arbitration never signed the operative agreement, but "both parties operated under its terms." 6 N.Y.3d at 374. In *Flores*, the party resisting the unsigned contract admitted an agreement and argued only that the writing was unenforceable. 4 N.Y.3d at 370–71. Plaintiffs stand in the same position as they concede that they agreed to receive UMR's services (Doc. 38 at 5), and Mr. Gill swore that UMR and the Plaintiff hospitals "entered into an agreement" for them. (Doc. 1 at 52, Gill Aff. ¶ 5.) He asserts that they did not sign the Services Agreement (*id.*, Gill Aff. ¶ 6), but no signature is required, and he identified no other terms or agreement.

Plaintiffs' silence argument post-notice of UMR's termination misreads the record. (Doc. 38 at 6–7.) UMR's June 1 notice terminating the Services Agreement under Sections 10.2(4) and 10.2(5) was emailed to Mr. Gill at his hsahospitals.com address, with HSA personnel copied, and Ms. Morris is aware of no response disputing that the Services Agreement governs. (Doc. 29-1 ¶ 17 & Doc. 29-5 Ex. D.) That the notice named AHS as "Customer" is beside the point, because

---

[3] Plaintiffs' suggestion that UMR could have required a separate signed agreement (Doc. 38 at 6) proves nothing. Here, Plaintiffs joined the existing account under the same group number, funded it, and paid the Fees the Services Agreement defines, without ever proposing different terms. *God's Battalion*, 6 N.Y.3d at 373–74; *Flores*, 4 N.Y.3d at 368–69.

Plaintiffs did not remain silent; they asked UMR to extend the termination date. (Doc. 29-1 ¶ 18.) UMR granted thirty days on terms requiring weekly funding and providing that "[p]ayments will first be applied to any current outstanding administrative fees." (Doc. 29-6 Ex. E.) Mr. Gill later swore that UMR "subsequently agreed" to continue processing claims under what he called the "Run Out Claims Agreement," and Plaintiffs attached that June 3 email in state court. (Doc. 1 at 52, 59, Gill Aff. ¶ 8.) Plaintiffs thus embraced, under oath, an extension of the termination date UMR had set under the Services Agreement. Plaintiffs concede that the termination "threatened to interrupt claims processing for Plaintiffs' employees" (Doc. 38 at 7), and the SAC alleges that UMR "based the termination on" the Services Agreement and then "ceased providing claims-administration services for the HSA Hospital Plaintiffs." (Doc. 24 ¶¶ 36, 66.)

Plaintiffs' position, in short, is that they performed every Customer obligation the Services Agreement imposes. They supplied eligibility data, funded the Bank Account, and paid the Fees, and they asked for and received an extension of a termination noticed under Sections 10.2(4) and 10.2(5). Yet they say the one term they dislike, Section 9, doesn't bind them. Plaintiffs never explain how they knew what to fund, what Fees to pay, or what information to send, other than through the Services Agreement.

### C. The August 2026 Exchange Between the Parties Confirms That the Services Agreement Governed the Run-Out.

Plaintiffs' conduct from April 2025 through July 2026 independently establishes their adoption of the Services Agreement. The August exchange only confirms it, and even read Plaintiffs' way, it does not undo what came before. Plaintiffs argue that the August exchange shows no acceptance, because Mr. Gill restricted funds to "HSA Claims and HSA Claims only" and UMR's August 14 letter stated that the parties "did not come to agreement." (Doc. 38 at 7–9.) But as UMR's Motion explained, the August 4 letter "did not create a new obligation"; it restated

the one Section 10.1 already imposed. (Doc. 28 at 12.) The exchange between the Parties in August 2026 is the last step in sixteen months of conduct under the Services Agreement.

UMR's August 4 letter, addressed to Mr. Gill as HSA's chief executive officer, offered run-out services "as applied to all benefit plans subject to the terms of the Agreement," provided that "Customer agrees to provide funding of $2 Million per week," and stated that "[a]ll terms and conditions of the ASA will continue to apply to the run-out services." (Doc. 29-7 Ex. F.) Mr. Gill replied: "As disccused [sic], HSA is committing to paying $2 million per week." (Doc. 29-8 Ex. G.) He thus took on the funding obligation that the letter assigned to the "Customer." UMR then agreed to proceed "in consideration of your agreement to be solely responsible for the terms of run-out." (*Id.*) Only after that did Mr. Gill write that "the $2 million dollars is for HSA Claims and HSA Claims only." (*Id.*) Plaintiffs then wired $2,000,000 into the existing HSA account. (Doc. 24 ¶ 47.) Plaintiffs attribute the wire to "Plaintiffs' parent company" (Doc. 38 at 2), but the SAC says HSA PGH sent it (Doc. 24 ¶ 47), and Mr. Gill defines "HSA" as all eight Plaintiffs (Doc. 1 at 52, Gill Aff. ¶ 3). "The general rule is that a party is bound by the admissions in his pleadings," *Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1177 (11th Cir. 2009) (quotation omitted), and plaintiffs may not amend their complaint through argument in a brief. *Cf. Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004).

This sequence answers the Opposition. Mr. Gill's caveat addressed how he wanted the money to be applied. It did not object to the Services Agreement governing the run-out. Section 10.1 already provided that its terms "will continue to apply to the run-out Services," and Section 10.3 preserves Section 9. (Doc. 29-2 Ex. A §§ 10.1, 10.3.) The August 14 letter confirms the point. It is captioned as a termination notice of the Services Agreement, describes the disagreement as one about "the proposed conditions for run-out services," and states that "Customer remains in

material breach of the ASA." (Doc. 38-1 at 2.) The parties disagreed about cross-group allocation, as the SAC itself pleads (Doc. 24 ¶ 48), not about whether the Services Agreement governed. Plaintiffs' remaining argument regarding whether UMR could make termination effective August 1 and retain funds (Doc. 38 at 8–9) is a merits question for the arbitrator.

**III. Alternatively, Direct-Benefits Estoppel Binds Plaintiffs.**

Plaintiffs argue that they never knowingly exploited the Services Agreement and seek only an accounting and the return of their funds. (Doc. 38 at 9–10.) A nonsignatory may be compelled to arbitrate when it "knowingly exploits" an agreement and "receives benefits flowing directly from the agreement." *Belzberg*, 21 N.Y.3d at 631. The "guiding principle is whether the benefit gained by the nonsignatory is one that can be traced directly to the agreement containing the arbitration clause." *Id.* at 633. The benefit in *Belzberg* was too attenuated because it flowed from a relationship with a third party. *Id.* at 634–35. Plaintiffs received and accepted the benefits of having UMR perform services for sixteen months "under the Services Agreement." (Doc. 29-1 ¶¶ 4, 15–16, 19.) Plaintiffs attribute those benefits to an affiliate relationship (Doc. 38 at 10), but the only relationship in the record through which UMR provided Services, collected Fees, and held Plaintiffs' funds is the one the Services Agreement creates. And like the nonsignatory in *Deloitte Noraudit*, Plaintiffs "failed to object to," and "knowingly accepted the benefits of" the agreement. *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1064 (2d Cir. 1993).

Plaintiffs' claims also depend on the Services Agreement. The SAC seeks a declaration of UMR's authority "to retain any residual after HSA claims, fees, and other properly chargeable amounts are accounted for," and the Opposition concedes that "authorized payments and charges" must be accounted for. (Doc. 24 at 17 ¶ g; Doc. 38 at 9.) The only sources in the record of those "fees," and of the order in which payments are applied, are the Services Agreement and the extension Plaintiffs requested. (Doc. 29-2 Ex. A §§ 1, 4 ("Fees"); Doc. 29-6 Ex. E.) Plaintiffs say

UMR must establish that authority if it invokes a disputed fee (Doc. 38 at 10), but Plaintiffs' own claim asks the Court to define it (Doc. 24 ¶ 98). A party "may not pick and choose which provisions suit its purposes." *God's Battalion*, 6 N.Y.3d at 374. *Ya Mon Expeditions, LLC v. Int'l Yacht Brokers Ass'n, Inc.*, (Doc. 38 at 10), is not to the contrary; the claims there rested on independent Sherman Act duties that required no "reference to or construction of" the contract. No. 25-10140, 2026 WL 1678244, at *8–9 (11th Cir. June 10, 2026) (quotation omitted). Plaintiffs' claims arise from the very Services the Services Agreement governs.

**IV. The Remaining Issues Are Unopposed, and No Discovery or Trial Is Warranted.**

Plaintiffs do not contest the scope of Section 9, that procedural prerequisites are for the arbitrator, that UMR has not waived arbitration, or that Section 3 requires a stay; they argue only that each point presupposes an agreement. (Doc. 38 at 10–11.) Their fallback request for "limited discovery" and a Section 4 trial fares no better. (*Id.* at 11.) A trial requires a genuine dispute of material fact supported by evidence. *Bazemore*, 827 F.3d at 1333; *Larsen*, 871 F.3d at 1308. Plaintiffs identify no fact they would seek and no witness who would contradict Ms. Morris; the facts that matter are within their own knowledge, and they chose not to address them under oath. Where no genuine dispute exists, there is no "second bite at the apple." *Larsen*, 871 F.3d at 1308.[4]

**CONCLUSION**

UMR requests that the Court compel arbitration of the claims in the SAC under Section 9 of the Services Agreement, stay this action under 9 U.S.C. § 3, *see Smith v. Spizzirri*, 601 U.S. 472, 478 (2024), and administratively close the case pending further order of the Court.

---

[4] Nor did Plaintiffs demand a jury trial of the formation issue in the Opposition, so any trial would be to the bench. *See* 9 U.S.C. § 4; *Burch v. P.J. Cheese, Inc.*, 861 F.3d 1338, 1349 & n.17 (11th Cir. 2017). The SAC's general jury demand (Doc. 24 at 18) does not suffice. *Burch*, 861 F.3d at 1349–50.

Dated: November 20, 2026

Respectfully submitted,

*/s/ Irene Bassel Frick*
Irene Bassel Frick, Esq.
Florida Bar No.: 0158739
Primary: irene.basselfrick@akerman.com
Secondary: nicole.emmett@akerman.com
Neema Mathew Monfared, Esq.
Florida Bar No.: 1035991
Primary: neema.monfared@akerman.com
Secondary: marykay.siegel@akerman.com
AKERMAN LLP
401 E. Jackson Street, Suite 1700
Tampa, Florida 33602
Telephone: (813) 223-7333

Scott E. Allbright, Jr.
Florida Bar No.: 102958
Primary: scott.allbright@akerman.com
Secondary: debra.atkinson@akerman.com
AKERMAN LLP
Three Brickell City Centre, Suite 1100
98 SE Seventh Street
Miami, Florida 33131
Telephone: (305) 374-5600

Allison P. Gallagher, Esq.
Florida Bar No.: 808911
Primary: allison.gallagher@akerman.com
Secondary: nicole.emmett@akerman.com
AKERMAN LLP
420 South Orange Avenue, Suite 1200
Orlando, Florida 32801
Telephone: (407) 423-4000

*Counsel for Defendant UMR, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 20, 2026, a true and correct copy of the foregoing was filed via CM/ECF, which will serve a copy on all counsel of record, including the counsel listed on the Service List below.

*/s/ Irene Bassel Frick*
Irene Bassel Frick, Esq.

## SERVICE LIST

Khurrum Wahid, Esq.
khurrum@wvglegal.com
Alex John Saiz, Esq.
Alex@wvglegal.com
David Geller, Esq.
david@wvglegal.com
Wahid Vizcaino Geller LLP
2103 Coral Way, Suite 401
Miami, Florida 33145
*Counsel for Plaintiffs*